UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

Caption in Compliance with D.N.J. LBR 9004-2(c)

**McCARTER & ENGLISH, LLP**
Four Gateway Center
100 Mulberry Street
Newark, NJ  07102
(973) 622-4444
(973) 624-7070 Facsimile
jlubertazzi@mccarter.com
Proposed Attorneys to Debtor in Possession
St. Mary's Hospital, Passaic, N.J.
Joseph Lubertazzi, Jr. (JL-3798)
Eduardo J. Glas (EG-7027)

Chapter 11

Case No.:

Judge:

In the Matter of:

ST. MARY'S HOSPITAL, PASSAIC, N.J.

Debtor-in-Possession.

## AFFIDAVIT OF COLENE Y. DANIEL IN SUPPORT OF DEBTOR'S VARIOUS FIRST DAY MOTIONS

STATE OF NEW JERSEY    )
                                          ) ss.
COUNTY OF PASSAIC      )

COLENE Y. DANIEL, of full age, being duly sworn according to law, upon her oath

deposes and states:

1.      I am the President and Chief Executive Officer of St. Mary's Hospital, Passaic, N.J.,

the within debtor and debtor-in-possession (the "Hospital" or the "Debtor").  I have served as the

Debtor's President and CEO since approximately April 14, 2008.  In addition, I have been working

as a hospital executive for over twenty (20) years, and I hold master's degrees in both public health

and health care administration.  I am a Fellow in the American College of Healthcare Executives.

2.    I am generally familiar with the Debtor's day-to-day operations, business affairs and records, and am authorized to make this Affidavit on the Debtor's behalf.

## I.    **INTRODUCTION**

3.    On March 9, 2009 (the "Petition Date"), the Debtor filed a voluntary petition for relief pursuant to Chapter 11, Title 11 of the United States Code (the "Bankruptcy Code"). Since the Petition Date, the Debtor has remained in possession of its assets and has continued management of its business as a debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

4.    To avoid the potentially disruptive impact that this Chapter 11 case might have on the Debtor's ability to continue operating, to protect the interests of the Debtor's patients, the community at large and other parties-in-interest, and to facilitate the orderly transition into Chapter 11, the Debtor has requested that the Court consider, on an expedited basis, the following motions filed simultaneously with the Debtor's Chapter 11 petition:

(a)    Application for Designation as a Complex Chapter 11 Case;

(b)    Motion for an Order Extending the Debtor's Time to File Schedules and Statement of Financial Affairs Pursuant to Fed. R. Bankr. P. 1007(c);

(c)    Motion for an Interim Financing Order (I) Authorizing the Debtor to Incur Post-Petition Indebtedness with Administrative Superpriority and Secured by Senior Liens in Substantially All Assets of the Debtor Pursuant to Section 364(c)(1), (c)(2), (c)(3) and (d) of the Bankruptcy Code, (II) Authorizing Assumption of Pre-Petition Obligations, (III) Granting Adequate Protection, (IV) Granting Other Relief, and (V) Scheduling a Final Hearing;

(d)    Motion for an Order (I) Authorizing the Debtor to Pay Certain Pre-Petition Claims of Physicians as Critical Vendors and (II) Granting Related Relief;

2

(e)    Motion for an Order Authorizing the Debtor to Satisfy, and Directing Payroll Banks to Honor, Prepetition Gross Salaries and Related Obligations to the Debtor's Employees and to Pay Prepetition Payroll and Withholding Taxes Associated with Prepetition Payroll;

(f)    Motion for an Order Authorizing the Debtor to Maintain Certain of Its Existing Bank Accounts, Authorizing the Debtor's Continued Use of its Existing Business Forms and Cash Management Systems, and Granting Related Relief;

(g)    Motion for an Order (I) Approving the Debtor's Adequate Assurance Payment for Post-Petition Utility Services; (II) Scheduling a Final Hearing to Determine Adequate Assurance; and (III) Granting Related Relief; and

(h)    Motion for an Order Authorizing the Payment of Pre-Petition Sales, Use, Property and Other Taxes and Governmental Charges and For Related Relief.

5.    The purposes of the First Day Motions are, among other things, to: (a) protect the Debtor's patients and the public during the Debtor's Chapter 11 case by ensuring the Debtor's ability to provide vital medical services; (b) maintain and bolster employee morale so as to reduce employee attrition during the Debtor's Chapter 11 proceeding; (c) enable the Debtor to continue operating as it pursues its restructuring; and (d) preserve the value of the Debtor's estate.  Each of the First Day Motions is crucial to the Debtor's ability to remain open and to provide high-quality care to its patients as it works to reorganize in a manner that best protects the public's health and interests as well as the interest of the Debtor's creditors.

6.    This Affidavit is intended to explain the circumstances precipitating the Debtor's Chapter 11 proceeding and to provide general information about the Debtor and its business operations that are germane to the First Day Motions.  The factual statements in this Affidavit are based on my personal knowledge, information supplied to me by others under my supervision, my

3

review of relevant documents and/or my opinions based on my experience and knowledge of the Debtor's operations and financial condition, and the healthcare industry in general. If called as a witness, I would testify to the facts set forth in this Affidavit. Unless otherwise indicated, all financial information contained herein is presented on an unaudited basis. I am authorized to submit this Affidavit.

## II.    THE DEBTOR'S BUSINESS AND BACKGROUND

### A.    The Debtor's Business

7.      The Debtor is a New Jersey non-profit corporation that owns and operates a 287-licensed bed acute-care community hospital located at 350 Boulevard, Passaic, New Jersey[1]. The Debtor is owned by a single corporate member, St. Mary Health Corporation (the "Corporation), a New Jersey non-profit holding corporation. Certain board members of the Debtor also serve on the board of the Corporation.

8.      The Debtor was founded in 1895 by the Sisters of Charity of St. Elizabeth and is the only remaining hospital in the city of Passaic. It has been considered by the Hospital Alliance of New Jersey to be a "vital safety net critical access" hospital.[2]   In 2008, the Debtor served approximately 13,000 inpatients, in addition to 10,500 patients requiring same-day procedures and 35,000 people who required Emergency Department services.

9.      The Debtor has approximately 1,550 employees. The Debtor is well-known for its comprehensive cardiac services program known as the "Eastern Heart Institute", which performed the first bypass surgery in the area. The Debtor serves cancer patients through its "Cancer Center", which features updated technology. In the Debtor's six-room Operating Suite, surgeons provide inpatient and outpatient care from general surgery, to arthroscopic and laparoscopic surgery, to laser

---

[1] In addition to the property at 350 Boulevard, the Debtor also owns other real property in the area.
[2] See "Examining the State of Our Healthcare System: The Unique Challenges Facing Urban Hospitals and Their Importance In Our State" by Hospital Alliance of New Jersey, published in October 2006.

ME1 8139139v.1

surgery. The Debtor's women's and children's center, called the BirthPlace, delivers approximately 1,300 babies annually.

10.    The Debtor also provides services in the areas of pain management and outpatient psychiatry, and features a sleep center and a wound center. The Debtor's Emergency Department features a trauma room for the care of severely injured or critically ill patients, eighteen patient beds, and a cast room. Cardiac monitoring for all chest pain patients is immediately available and complemented by specialized cardiac care and specially-trained personnel. Diagnostic radiology services are also available 24 hours a day for CT scans, ultrasounds, and other important procedures.

11.    Outreach services include a Community Health Education Department which holds pre-natal classes for expectant mothers and provides health and wellness presentations to community groups.

12.    The Debtor is accredited by The Joint Commission on Accreditation of Healthcare Organizations, the College of American Pathologists, Commission on Laboratory Accreditation, American College of Radiology and AABB. The Debtor is a member of the Catholic Health Association, The American Hospital Association, The New Jersey Hospital Association, the Hospital Alliance of New Jersey, the American Management Association, the New Jersey Business and Industry Association and the New Jersey Regional Chamber of Commerce.

13.    As of December 31, 2008, the Debtor had total assets and liabilities in excess of $50,000,000, respectively. A copy of the Debtor's balance sheet as of December 31, 2008, reflecting book values, is attached hereto as Exhibit "A". In 2008, the Debtor had operating revenue totaling approximately $155,000,000 and an operating loss (unaudited) of approximately $16,500,000. A copy of the Debtor's income statement as of December 31, 2008 is attached hereto

5

as Exhibit "B". For the first month of 2009, the Debtor recorded an operating loss of approximately

$800,000 against total operating revenues of approximately $12,800,000. A copy of the income

statement is attached hereto as Exhibit "C". As discussed in greater detail below, the Debtor's

losses are attributable to, inter alia, declining patient volumes and an increase in expenses required

to support and maintains acquired assets.

**B.    The Debtor's Prepetition Secured Debt**

14.    The New Jersey Health Care Facilities Financing Authority (the "Authority") was

organized and it exists pursuant to the provisions of the New Jersey Health Care Facilities

Financing Authority Law, P.L. 1972, Chapter 29, N.J.S.A. 26:2I-1 et seq. (the "Act"). The Debtor

entered into a Loan Agreement ("First Loan Agreement") with the Authority dated as of February 1,

2007 (the "First 2007 Financing"). The First 2007 Financing included the Authority's issuance of

$35,460,000 in Series 2007A Hospital Revenue Bonds and $9,690,000 in Series 2007B Hospital

Revenue Bonds. As evidence of the obligation to repay the First Loan Agreement, the Debtor

executed and delivered a Mortgage Note dated February 1, 2007 (the "Note") in the principal

amount of $45,150,000 bearing interest rates ranging from 4.0% to 5.09%. The Note was issued

pursuant to and is secured under a Master Trust Indenture, dated as of February 1, 2007 (the

"Master Trust Indenture") between the Debtor and the Bank of New York, as Master Trustee (the

"Master Trustee").

15.    In connection with the First Loan Agreement, the Debtor executed and delivered to

the Master Trustee a mortgage and security agreement dated February 1, 2007 (the "First Mortgage

and Security Agreement"), an Absolute Assignment of Leases, Rents, Income and Profits (the "First

Assignment of Leases"), an Absolute Assignment of Contract Rights (the "First Assignment of

Contracts") and an Environmental Compliance and Indemnity Agreement (the "First Environmental

Indemnity Agreement"), each dated February 1, 2007. The First Loan Agreement, First Note, First Mortgage and Security Agreement, First Assignment of Leases, First Assignment of Contracts and First Environmental Indemnity Agreement are referred to herein as the "First Pre-Petition Loan Documents".

16.     The First Pre-Petition Loan Documents were then superseded by a second Loan Agreement ("Second Loan Agreement") with the Authority dated as of April 1, 2007 (the "Second 2007 Financing") in order for the First Pre-Petition loan documents to be re-funded and to cover the costs of issuance of new State contract bonds. In connection with the Second 2007 Financing, the Debtor executed and delivered a Promissory Note dated April 1, 2007 (the "Second Note") in the principal amount of $45,425,000 bearing interest at rates ranging from 4.0% to 5.04%. The Second 2007 Financing included the Authority's issuance of $27,925,000 in Series 2007-1 Hospital Revenue Bonds and $17,500,000 in State Contract Bonds. The Second Note was issued pursuant to and was secured under the Master Trust Indenture and a Second Supplemental Indenture, dated as of April 1, 2007 (the "Second Supplemental Indenture" and, collectively with the Master Trust Indenture, the "Master Indenture") between the Debtor and the Master Trustee. In addition, the Debtor executed and delivered to the Master Trustee an amended mortgage and security agreement dated February 1, 2007 (the "Amended Mortgage and Security Agreement"), an amended Absolute Assignment of Leases, Rents, Income and Profits (the "Amended Assignment of Leases"), an amended Absolute Assignment of Contract Rights (the "Amended Assignment of Contracts") and an Environmental Compliance and Indemnity Agreement (the "Amended Environmental Indemnity Agreement"), each dated April 1, 2007. The Second Loan Agreement, Second Note, Amended Mortgage and Security Agreement, Amended Assignment of Leases, Amended Assignment of Contracts and Amended Environmental Indemnity Agreement are referred to herein as the "Second

ME1 8139139v.1

Pre-Petition Loan Documents".

17.    Under the First and Second Pre-Petition Loan Documents, the Master Trustee has

liens and security interests upon the Debtor's real properties at 346-424 Boulevard, 11; 86; 96 and

98 Linden Street and 13 Beech Street, Passaic, New Jersey; buildings, structures and improvements

on both properties; easements; appurtenances; machinery; apparatus; equipment fittings; fixtures;

tangible personal property connected with the real property; right and title to lease agreements;

rents, incomes, profits, revenues, accounts, contract rights and intangibles connected to the Debtor's

real property; any proceeds from insurance or condemnation actions, and any accounts, chattel

paper, deposit accounts and general intangibles (collectively, the "Master Trustee's Collateral").

18.    As of the Petition Date, the Master Trustee is asserting a claim against the Debtor in

an amount of approximately $43 million (the "Master Trustee's Pre-Petition Debt")

19.    In addition, the Debtor entered into a certain $20,000,000 Loan and Security

Agreement, dated as of February 28, 2007, with HFG Healthco-4 LLC ("HFG-4") as lender,

pursuant to which HFG-4 agreed to make working capital revolving loans up to a maximum of

$20,000,000 (the "Revolving Loan"). The Revolving Loan is secured by a lien on the Debtor's

account receivables and a mortgages on real properties located at 176, 191, and 211 Pennington

Avenue, Passaic, New Jersey (the "Revolving Loan Collateral"). The real properties located at 176

and 191 Pennington Avenue are being used as parking lots for the hospital. As of the Petition Date,

HFG-4 is asserting a claim against the Debtor for approximately $9,000,000 on account of the

Revolving Loan (the "Revolving Loan Pre-Petition Debt").

20.    On or about June 5, 2008, the Debtor executed a Term Note in the principal amount

of $5,000,000 the "Term Loan") in favor of HFG Healthco-6 LLC ("HFG-6"). The HFG-6 Term

Loan is secured by a mortgage on the Debtor's real properties located at 176, 191 and 211

8

Pennington Avenue, Passaic, New Jersey and by a lien on the Debtor's account receivables (the "Term Loan Collateral"). As of the Petition Date, HFG-6 is asserting a claim against the Debtor for approximately $3,000,000 on account of the HFG Term Loan.

21.     On or about June 5, 2008, HFG-4 and HFG-6 entered into an Intercreditor Agreement (the "Intercreditor Agreement") to establish their respective priorities over the Revolving Loan Collateral and the Term Loan Collateral. Pursuant to the Intercreditor Agreement, HFG-4 has a first lien over the account receivables of the Debtor and a subordinated lien to HFG-6's on the real properties located at 176, 191 and 211 Pennington Avenue (the "Pennington Avenue Properties"). Pursuant to the Intercreditor Agreement too, HFG-6 has a first lien over the real properties located at 176, 191 and 211 Pennington Avenue and a subordinated lien to HFG-4's over the account receivables of the Debtor.

22.     On or about April 11, 2007, the Master Trustee and HFG-4 entered into a Subordination Agreement pursuant to which the Master Trustee acknowledged that HFG-4's lien on the Debtor's account receivables was senior to the Master Trustee's.[3]

23.     On or about June 5, 2008, the Master Trustee and HFG-6 entered into a Subordination Agreement pursuant to which the Master Trustee acknowledged that HFG-6's lien over the account receivables and the Pennington Avenue Properties was senior to the Master Trustee's.

### III.     FACTORS PRECIPITATING THE DEBTOR'S CHAPTER 11 FILING

24.     As stated in the "New Jersey Commission on Rationalizing Health Care Resources Interim Report," published by the Office of Governor Jon S. Corzine on June 29, 2007, New Jersey's hospitals are imbedded in a healthcare delivery system being "buffeted by numerous forces

---

[3] The Master Trustee, HFG-4 and HFG-6 are collectively referred as the "Secured Creditors." The Master Trustee's Collateral, the Revolving Loan Collateral and the Term Loan Collateral are collectively referred as the "Prepetition Collateral."

MEI 8139139v.1

largely or wholly outside of their control, including: the emergence of costly new health technology; growing labor shortages, especially of nurses and other highly skilled health workers; a shift of ever more of the delivery of care from the inpatient to ambulatory facilities, with many of the latter owned and operated by teams of independent entrepreneurs and physicians; a gradual but inexorable erosion of the employment-based health insurance system, especially among low-wage workers, without a replacement system in sight; the associated growing number of low-income residents without health insurance and ability to pay for costly care, whom hospitals must serve nevertheless; and fiscal pressures from the federal and state governments seeking to control their budgets in part by reimbursing hospitals at fees far below the cost of caring for publicly insured patients."

25.   The Debtor, too, has suffered from the aforementioned threats to its existence. Over the last few years, in particular, the Debtor has experienced a steady decline in patient volume resulting from, in part, an industry-wide increasing shift toward the delivery of care from the inpatient to ambulatory facilities, with many of the latter owned and operated by teams of independent entrepreneurs and physicians. Moreover, the Debtor serves a growing number of low-income residents with no health insurance or ability to pay for costly care.

26.   The Debtor has also suffered from a recent increase in expenses, as a result of the need to pay for costs associated with assets that were acquired through absorptions of two other regional hospitals. In January 2004, Passaic Beth Israel Regional Medical Center acquired the General Hospital Center of Passaic. Thereafter, in March 2007, the Debtor purchased the assets of Passaic Beth Israel Hospital.

27.   The Debtor's acquisition of Passaic Beth Israel Hospital's assets was to be funded through bonds issued by the New Jersey Healthcare Facilities Financing Authority, as discussed above; a line of credit secured by accounts receivable, also discussed above; and the proceeds of the

sale of the Debtor's former hospital property located at 211 Pennington Avenue.

28.    The declining real estate market adversely affected the Debtor's ability to sell 211 Pennington Avenue, and the inability to sell had a domino effect on St. Mary's business plan. The Debtor was required to pay carrying costs for the Pennington facility, which adversely affected cash flow. The inability to sell the real property resulted in a lack of funds needed to make necessary capital improvement to the 350 Boulevard location. The inability to make capital improvements to the 350 Boulevard location has resulted in less interest among physician groups to work with the Debtor, which, in turn, has adversely affected the Debtor's ability to achieve expected census figures. Given the uncertainty over the Debtor's finances, vendors are not providing the Debtor with normal credit terms.

29.    The Debtor's 2007 audited net loss was $25,000,000. Moreover, by June 30, 2008, the Debtor had unfunded accrued pension liability of $11,919,000; accounts payable of $27,299,000; an accounts receivable line of $9,166,000; and a bond payable of $45,000,000.

30.    By mid-2008, the Debtor understood that absent any immediate capital infusion, the Debtor might be unable to continue. The Debtor therefore began taking steps to increase revenue by changing its managerial direction, reducing expenses and reviewing its contracts to determine whether they are beneficial or burdensome. The Debtor also contemplated a search for a strategic partner or a purchaser of its assets.

31.    In considering its options, the Debtor focused, first, on the speed with which it would be able to consummate either a partnership with another hospital system or a partnership with another healthcare entity, such as a for-profit entity. In searching for possible lenders or strategic partners, the Debtor had an eye toward those entities that would continue to allow it to operate as a Catholic Hospital.

MEI 8139139v.1

32.     On November 10, 2008, the Debtor circulated a Request for Proposals ("RFP"). The RFP set forth the Debtor's business, operations, financial conditions and prospects. It also set forth in clear terms the Debtor's "Desired Outcomes and Selection Criteria" addressing issues relating to cost savings, revenue, services, physicians, quality and best practice, governance, access to capital, assumption of liabilities, and values and culture.

33.     The Debtor provided potential bidders with access to certain books and records and the Debtor's facilities to perform due diligence in connection with a potential sale.

34.     Since November 10, 2008, the Debtor has been contacted by three (3) bidders. The first bidder is JPL Healthcare Consulting, LLC. The second bidder is Paradigm Physician Partners, LLC ("Paradigm"). The third bidder is St. Joseph's Healthcare System. While each of the bidders presented restructuring proposals, the Debtor's significant debt and vendor issues have caused the Debtor to seek Chapter 11 relief without a strategic partnership at this time.

## IV. <u>SUMMARY OF FIRST DAY MOTIONS</u>

35.     Concurrently with the filing of its Chapter 11 petition, the Debtor has filed certain applications, motions, and proposed orders (collectively, the "First Day Motions") in order to minimize the adverse effects of the commencement of the Debtor's bankruptcy case on its business and the reorganization process. The factual background and support of each First Day Motion is set forth below and/or set forth in the respective First Day Motion, which I have reviewed and certify that the facts contained therein are true and correct to the best of my information, knowledge and belief.

### A.    **Application For Designation As A Complex Chapter 11 Case**

36.     As of December 31, 2008, the Debtor had total assets and liabilities of at least $50 million respectively, and more than 1,000 creditors. Being designated as a complex Chapter 11 case will enable the Debtor to effectively and efficiently administer the case in compliance with the

ME1 8139139v.1

Court's rules and guidelines.    Accordingly, the Debtor respectfully requests that the within

proceedings be designated a Complex Chapter 11 case.

**B.    Motion For an Order Extending the Debtor's To Extend Time To File Schedules And Statement Of Financial Affairs As Required By Bankruptcy Rule 1007(c)**

37.    The Debtor respectfully requests that the Court enter the order filed concurrently

herewith extending the date for it to file its Schedules and Statement of Financial Affairs until April

20, 2009.

38.    During the initial phase of its Chapter 11 case, the Debtor will necessarily be

preoccupied by other emergent matters relating to the commencement of its case and stabilization of

its business. This is also a large and complex case which will require assembling and organizing

data from numerous sources within the Debtor and the Debtor's business. As a result, the Debtor

will not be able to complete the Schedules within the current period of time provided.    Therefore,

the Debtor request an extension of the deadline to files its Schedules and Statement of Financial

Affairs until April 20, 2009.

**C.    Motion for an Interim Financing Order (I) Authorizing the Debtor to Incur Post-Petition Indebtedness with Administrative Superpriority and Secured by Senior Liens in Substantially All Assets of the Debtor Pursuant to Section 364(c)(1), (c)(2), (c)(3) and (d) of the Bankruptcy Code, (II) Authorizing Assumption of Pre-Petition Obligations, (III) Granting Adequate Protection, (IV) Granting Other Relief, and (V) Scheduling a Final Hearing**

39.    As a result of the Debtor's current financial issues, the Debtor has virtually no cash

not subject to a lien to fund its ongoing operations.    Without additional funds, the Debtor will likely

face a substantial if not devastating loss of revenue which may result in a tightening or elimination

of credit, delayed deliveries, loss of vendors and loss of employees, which could imperil patients.

HFG-4 is the Debtor's existing lender.    As a result of this existing relationship, the Debtor was able

to obtain more favorable credit terms than would have been the case if a new lender had stepped in

to make a new loan. The Debtor has thus avoided due diligence expenses and associated delays by

continuing its existing credit facility post-petition. The Debtor consulted with its professionals who have experience and know the credit markets available to debtors in bankruptcy. In this regard, the Debtor's professionals deemed the deal struck with HFG-4 as more favorable than the terms available from other lenders.

40.    The Debtor negotiated the terms of the Postpetition Financing and the DIP Agreement with the Lender at arms' length and in good faith (as defined in section 364(c) of the Bankruptcy Code). The Debtor, in its business judgment, believes that the negotiated terms are fair and reasonable under the circumstances of this case.

**D.    Debtor's Motion for an Order (I) Authorizing the Debtor to Pay Certain Pre-Petition Claims of Physicians as Critical Vendors and (II) Granting Related Relief**

41.    The physicians of St. Mary's are essential to the continued operation of the Debtor's business and successful reorganization are the hospital's "critical vendors". In short, the physicians are the "life blood" of the Debtor's business and provide services essential to the safety, care and health of the Debtor's patients. Accordingly, the Debtor seeks to pay physicians all pre-petition amounts owing to the physicians employed by St. Mary's Hospital, as permitted by the Bankruptcy Code and attendant case law.

**E.    Debtor's Motion for an Order Authorizing the Debtor to Satisfy, and Directing Payroll Banks to Honor, Prepetition Gross Salaries and Related Obligations to the Debtor's Employees and to Pay Prepetition Payroll and Withholding Taxes Associated with the Prepetition Payroll**

42.    The Debtor requests that it be authorized, in its sole discretion, to pay the aggregate amount of accrued wages and salaries that have not yet been paid to the employees for Pre-Petition work. As of the Petition Date, the Debtor employed approximately 1,550 employees (the "Employees"). The aggregate amount of wages paid, including taxes, to Employees is approximately $2.9 million every two weeks. The pay day for salaries and wages accrued from

14

Sunday, February 22, 2009 through Saturday, March 7, 2009 would be Friday, March 13, 2009 (there is a one week lag in paychecks being issued). A new pay period commenced yesterday, March 8, 2009.

43.    Given the timing of the Debtor's petition, as of the Petition Date, the unpaid wage and salary obligations owed by the Debtor to the Employees would be (a) amounts owed on account of services provided from February 22, 2009 through March 7, 2009; and (b) amounts owed on account of services provided on March 8, 2009 (the "Pre-Petition Pay Period"). The Debtor requests authority to pay the Employees for the Pre-Petition Pay Period.

44.    It is also possible that checks that have been previously issued to the employees may have not yet been presented for payment or may have not yet cleared. Thus, the Debtor requests that it be authorized, in its sole discretion, to pay the aggregate amount of accrued wages and salaries that have not yet been paid to the Employees for periods prior to the Petition Date, and that the Banks be authorized and directed to honor or send all checks or wire transfers, as the case may be, for all pre-petition wages (collectively, "Payroll Obligations") that have either already been sent on behalf of the Employees but not yet presented for payment or have yet to clear through the banking system.

45.    The Debtor is required by law to withhold from its Employees' wages all applicable federal, state, and local income taxes, state unemployment taxes, and social security and Medicare taxes, and in certain instances, to pay expenses related thereto (collectively, the "Trust Fund Taxes"). The Debtor is also required to remit the Trust Fund Taxes to the appropriate taxing authorities. The Debtor therefore requests that it be authorized, in its sole discretion, to pay the Trust Fund Taxes incurred in connection with the Employees for periods prior to the Petition Date

46.    In addition, the Debtor makes deductions from the Employees' paychecks for health

MEI 8139139v.1

care benefit programs, insurance, garnishments, support payments, union dues, charitable contributions, flexible spending (via what is commonly known as "flex accounts") and other similar programs (the "Deductions") and makes payments on behalf of the employees to such third party benefit providers. The Debtor transfers such Deductions to the appropriate government agencies and/or benefit providers in accordance with the payment schedules established by such agencies and/or providers. The Debtor seeks authority to transfer the Deductions in accordance with the aforementioned payment schedules established by such agencies and/or providers.

47.    Finally, in the ordinary course of their duties on the Debtor's behalf, various Employees may have, pre-petition, incurred certain business expenses for which they are customarily reimbursed by the Debtor (the "Expense Reimbursement Obligations"). The Debtor seeks authority to reimburse Employees for the pre-petition Expense Reimbursement Obligations.

**F.    Debtor's Motion for an Order Authorizing the Debtor To Maintain Certain of Its Existing Bank Accounts and Authorizing the Debtor's Continued Use of Its Existing Business Forms and Cash Management Systems, and Granting Related Relief**

48.    As of the Petition Date, the Debtor maintained a total of twenty-four (24) bank accounts with various banking institutions for use in its operations (collectively, the "Pre-Petition Bank Accounts"). A number of the Debtor's Pre-Petition Bank Accounts were acquired with the assets of Passaic Beth Israel Hospital in 2004. In addition, a number of the Pre-Petition Bank Accounts were "dormant," as of the Petition Date, and had few or no withdrawals or deposits.

49.    The Debtor has opened a "debtor in possession account" in accordance with the United States Trustee's operating guidelines for the use of cash collateral. In addition, the Debtor seeks authority to keep open fifteen (15) of the Pre-Petition Accounts (collectively, the "Open Accounts")

50.    Specifically, the Debtor requests as follows:

MEI 8139139v.1

a.    The Debtor seeks to keep open the Payroll Account in order to be able to make payments for pre-petition wages, related obligations and taxes as requested in two (2) of the First Day Motions being filed herewith.

b.    The Debtor seeks to keep open five (5) checking accounts, in which the Debtor holds, "in trust," approximately $5.2 million in grant funds from the State of New Jersey for distribution to and use by mentally challenged patients enrolled in the Debtor's behavioral health programs.

c.    The Debtor seeks to keep open an account for Medicaid and Medicare deposits, so that the Debtor may continue to receive deposits as a result of claims that were presented to both federal programs in connection with services rendered to patients.

d.    The Debtor seeks to keep open a Qualcare Account, which is a bank account that holds funds in connection with the Qualcare self-insurance program run by the Debtor. In order to ensure that the Debtor's employees are able to receive reimbursement for pre-petition claims submitted, and so as to effectuate the First Day Motions in support of payment of payroll-related obligations of employees, the Debtor seeks to keep the Qualcare Account open at this time.

e.    The Debtor seeks to keep open a Money Market Account, one (1) active Certificate of Deposit with Valley National Bank, and five (5) interest-yielding savings accounts with Valley National Bank. The Debtor seeks to keep these accounts open so as to avoid suffering a penalty or loss of interest should the Debtor withdraw the investments or close the accounts at this time.

51.    Additionally, in the ordinary course of its business, the Debtor uses a variety of checks and other business forms, including purchase orders, checks, packing slips, letterhead, and invoices (collectively, the "Business Forms"). The Debtor requests that this Court enter an order

17

permitting the Debtor to continue to use the Business Forms without alteration or change. Changing correspondence and business forms would be unnecessary and burdensome to the estate, as well as expensive and disruptive to the Debtor's reorganization records. Accordingly, the Debtor seeks to continue use of its existing cash management system and business forms.

**G.    Debtor's Motion for an Order (I) Approving the Debtor's Adequate Assurance Payment for Post-Petition Utility Services; (II) Scheduling a Final Hearing to Determine Adequate Assurance; and (III) Granting Related Relief**

52.    The Debtor seeks entry of a Court order prohibiting the Debtor's utility service providers from altering, refusing or discontinuing utility services on account of pre-petition invoices, including the making of demands for security deposits or accelerated payment terms and approving adequate assurance payments for pre-petition utility services.

53.    In connection with the operation of its business, the Debtor obtains electricity, water, telephone, and/or other similar services (collectively, the "Utility Services"), from approximately ten (10) different utility companies (the "Utility Companies").

54.    The Debtor proposes to provide adequate assurance of payment to the Utility Companies for Utility Services provided to the Debtor following the Petition Date in the form of security deposits to the Utility Companies over the previous three (3) months of prepetition obligations to the Utility Companies, divided by ninety-one (91) days and multiplied by ten (10). The Debtor asserts that the above calculations will provide adequate assurance to the Utility Companies of payment for future services.

55.    If the Utility Companies are permitted to terminate Utility Services, there would be immediate severe consequences caused by the resulting interruption in patient care. Because uninterrupted utility service is vital to the Debtor's business, the health and safety of the Debtor's patients and necessary to the Debtor's reorganization efforts and, consequently, to the success of

ME1 8139139v.1

this chapter 11 case, the relief requested herein is necessary and in the best interests of the Debtor's

estate and its creditors. Accordingly, the Debtor seeks entry of an order prohibiting the Debtor's

utility service providers from altering, refusing or discontinuing utility services on account of pre-

petition invoices, including the making of demands for security deposits or accelerated payment

terms and approving adequate assurance payments for pre-petition utility services.

**H.    Debtor's Motion for an Order Authorizing the Payment of Prepetition Sales, Use, Property, Other Taxes and Governmental Charges and For Related Relief**

56.    In the ordinary course of business, the Debtor incurs certain sales, use, property, and

other taxes and governmental charges (collectively, the "Taxes") that are payable directly to various

state, local and federal taxing authorities (collectively, the "Taxing Authorities") as such payments

become due.

57.    The Debtor therefore requests entry of an order (i) authorizing the Debtor, in its sole

discretion, to pay certain accrued and outstanding pre-petition taxes owed to the State of New

Jersey in the approximate amount of $285,000, which are "trust fund taxes"; (ii) authorizing banks

and other financial institutions to honor and process all checks and wire transfers related to the

payment of pre-petition sales, use, property and other taxes and governmental charges that have not

yet cleared through the banking system; and (iii) for related relief.

## V.    THE DEBTOR'S OBJECTIVES IN CHAPTER 11

58.    The Debtor intends to utilize the Chapter 11 process to obtain a "breathing period" in

which it can seek to implement a financial restructuring that is fair to all its creditor constituents and

that allows the Debtor to serve its community constituents. The Debtor's existing revenue stream

and post-petition use of cash collateral should provide sufficient additional working capital and cash

flow to enable the Debtor to continue to operate and provide high-quality healthcare services to the

citizens of Northern New Jersey, while it takes necessary steps to reorganize.

MEI 8139139v.1

59.    The relief requested by the First Day Motions is necessary to allow the Debtor to stabilize its affairs as it transitions into Chapter 11.  It is therefore respectfully requested that the Court grant each of the Debtor's First Day Motions and enter the proposed Orders accompanying same

COLENE Y. DANIEL, M.S., M.P.H., FACHE
President and Chief Executive Officer
St. Mary's Hospital, Passaic, N.J.

Sworn and subscribed to before
me this 9th day of March 2009.

Meena Untawale
Attorney at Law
State of New Jersey

20

# EXHIBIT "A"

ME1 8139139v.1

Page 5

**ST. MARY'S HOSPITAL**
Comparative Balance Sheets
(in thousands $000)

| Assets | 12/31/2008 | Activity | 11/30/2008 |
|---|---|---|---|
| **Current assets:** | | | |
| 1. Cash and cash equivalents | 3,240 | 3,179 | 61 |
| 2. Patient receivables, net | 17,797 | (905) | 18,702 |
| 3. Receivable - Stabilization Fund | 3,000 | 3,000 | 0 |
| 4. Other receivables | 1,561 | 468 | 1,093 |
| 5. Total accounts receivable | 22,358 | 2,563 | 19,795 |
| 6. Inventories | 3,295 | 461 | 2,834 |
| 7. Prepaid expenses | 344 | 47 | 297 |
| 8. Total current assets | 29,237 | 6,250 | 22,987 |
| 9. Property, plant and equipment, net | 27,773 | (237) | 28,010 |
| 10. Assets held for sale | 11,580 | 0 | 11,580 |
| 11. Deferred bond issuance expense | 1,680 | (8) | 1,688 |
| 12. Other receivables, long term | 0 | 0 | 0 |
| **Assets whose use is limited:** | | | |
| 13. Board Designated Fund | 290 | 0 | 290 |
| 14. Donor Designated-Restricted Fund | 114 | 0 | 114 |
| 15. Funds held by bond trustee | 84 | 0 | 84 |
| 16. Total assets limited as to use | 488 | 0 | 488 |
| 17. Total Assets | 70,758 | 6,005 | 64,753 |

| | 12/31/2008 | Activity | 11/30/2008 |
|---|---|---|---|
| **Current liabilities:** | | | |
| 18. Bond Payable, current portion | 1,536 | 18 | 1,518 |
| 18. AR Line of Credit | 10,838 | 596 | 10,242 |
| 19. Loan Payable | 2,900 | (50) | 2,950 |
| 20. Pension Liability, current portion | 69 | 0 | 69 |
| 21. Accounts payable and accrued expenses | 29,174 | 18 | 29,156 |
| 22. Accrued payroll and vacation | 7,002 | 310 | 6,692 |
| 23. Deferred Revenue | 6,383 | (578) | 6,961 |
| 24. Deferred Revenue - Stabilization Fund | 6,000 | 6,000 | 0 |
| 25. Estimated amount due to payors, current | 8,527 | 717 | 7,810 |
| 26. Total current liabilities | 72,429 | 7,031 | 65,398 |
| **Long term liabilities:** | | | |
| 27. Bond Payable, less current portion | 42,655 | (143) | 42,798 |
| 28. Other long term liabilities | 930 | 0 | 930 |
| 29. Pension liability, long term | 12,452 | 89 | 12,363 |
| 30. Total long term liabilities | 56,037 | (54) | 56,091 |
| **Net Assets:** | | | |
| 31. Unrestricted | (57,822) | (970) | (56,852) |
| 32. Temporarily restricted | 114 | 0 | 114 |
| 33. Total Net assets | (57,708) | (970) | (56,738) |
| 34. Total Liabilities & Net Assets | 70,758 | 6,007 | 64,751 |

# EXHIBIT "B"

ME1 8139139v.1

**St. Mary's Hospital**
Comparative Statement of Revenue and Expenses
For the Eleven months ended December 31, 2008
In Thousands ($000)

| | Actual Year-to-Date 12/31/2008 | Budget Year-to-Date 12/31/2008 | Variance (Unfavorable) Favorable |
|---|---|---|---|
| Net Patient Service Revenue | 152,786 | 161,848 | (9,062) |
| Prior Year Settlement | 55 | 0 | 55 |
| Hospital Stabilization Fund | 1,000 | 0 | 1,000 |
| Other Operating Revenue | 1,155 | 1,284 | (129) |
| **Total Operating Revenue** | **154,996** | **163,132** | **(8,136)** |
| Salaries | 73,818 | 70,482 | (3,336) |
| Physician Fees | 3,915 | 3,786 | (129) |
| Employee Benefits | 18,555 | 18,620 | 65 |
| Supplies & Other Expenses | 62,766 | 60,778 | (1,988) |
| Interest Expense | 4,349 | 4,500 | 151 |
| Insurance Expense | 1,571 | 1,463 | (108) |
| Depreciation and Amortization | 2,984 | 3,612 | 628 |
| **Total Operating Expenses** | **167,958** | **163,241** | **(4,717)** |
| **Net Operating Income (Loss)** | **(12,962)** | **(109)** | **(12,853)** |
| Non- Operating Revenue | 337 | 324 | 13 |
| St.Mary's Carrying Costs | (3,770) | (3,749) | (21) |
| St.Mary's Severance | (150) | 0 | (150) |
| **Increase (Decrease) in Net Assets** | **(16,545)** | **(3,534)** | **(13,011)** |

# EXHIBIT "C"

ME1 8139139v.1

**St. Mary's Hospital**

Comparative Statement of Revenue and Expenses

For the Month Ended January 31, 2009

In Thousands ($000)

| | Actual Current month 1/1/2009 | Budget Current month 1/1/2009 | Variance (Unfavorable) Favorable |
|---|---|---|---|
| Net Patient Service Revenue | 11,649 | 12,878 | (1,229) |
| Hospital Stabilization Fund | 1,000 | 1,000 | 0 |
| Other Operating Revenue | 146 | 153 | (7) |
| **Total Operating Revenue** | **12,795** | **14,031** | **(1,236)** |
| Salaries | 5,936 | 5,875 | (61) |
| Physician Fees | 328 | 354 | 26 |
| Employee Benefits | 1,532 | 1,677 | 145 |
| Supplies & Other Expenses | 4,857 | 5,671 | 814 |
| Interest Expense | 387 | 365 | (22) |
| Insurance Expense | 215 | 237 | 22 |
| Depreciation and Amortization | 316 | 346 | 30 |
| **Total Operating Expenses** | **13,571** | **14,525** | **954** |
| **Net Operating Income (Loss)** | **(776)** | **(494)** | **(282)** |
| Non- Operating Revenue | 12 | 21 | (9) |
| **Increase (Decrease) in Net Assets** | **(764)** | **(473)** | **(291)** |